THE HONORABLE ROBERT S. LASNIK

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

ISHOW.COM, INC.,

Plaintiff,

v.

LENNAR CORPORATION, AND LENNAR
PACIFIC PROPERTIES MANAGEMENT, INC.

Defendants.

Civil Action No. 2:15-cv-01550

**PLAINTIFF ISHOW.COM, INC.'S
TRIAL BRIEF**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFF'S TRIAL BRIEF - 1
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES℠

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... 4

I.     INTRODUCTION ..................................................................... 7

II.    RELEVANT FACTS ................................................................ 8

    A. iShow's Early Years ................................................................ 8

    B. iShow's Continued Growth into Residential Homes ........................... 9

    1.    iShow Developed Its Core Business Around Building Demonstration Homes  9

    2.    iShow Has Expanded Beyond Demonstration Homes Since 2003 ................ 10

    3.    iShow's Growth in 2011 and Beyond............................................ 12

    C. Lennar's Knowledge of The NEXTGEN Brand ................................. 14

    D. Lennar's Initial Use of NEXT GEN and iShow's Opposition .................. 14

    E. Lennar's National Expansion and Resulting Profit ............................. 15

III.   ARGUMENT IN SUPPORT OF iSHOW'S CLAIMS ......................... 16

    A. The Jury Can Reasonably Find that NEXTGEN Is Suggestive ................ 16

    B. The Jury Can Reasonably Find that NEXTGEN Acquired Distinctiveness by the Time Lennar Entered the Marketplace .................................. 17

    C. The Jury Will Find the Parties' Respective Uses to be Related .............. 18

    D. iShow Will Prove It Is Entitled to Lennar's Profits ........................... 19

    1.    The Evidence Will Support an Award of Lost Profits.......................... 19

    2.    Willfulness and Disgorgement Is Unsettled .................................... 20

    3.    Disgorgement of Profits Can Serve as a Proxy for Actual Damages ............. 22

    E. iShow Will Prove that Lennar's Infringement Is Willful...................... 22

IV.    ARGUMENT OPPOSING LENNAR'S DEFENSES........................... 23

    A. Lennar Has Waived Its Right to Assert Affirmative Defenses Not Plead In Its Amended Answer ............................................... 23

LOWE GRAHAM JONES PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

B. This Court Already Rejected Lennar's Defense of Issue Preclusion and Rule 12(b)(6) Arguments .......................................................................................... 25

C. A Choice of Law Analysis Warrants The Use of Nevada's Four-Year Statute of Limitations .................................................................................................... 25

D. Lennar's Laches Defense Is Untenable .............................................................. 27

1. iShow Has Diligently Enforced Its Mark ...................................................... 27

2. iShow Will Be Harmed If Relief Is Denied .................................................... 28

3. Lennar's Willful Infringement Is a Complete Bar to Relief ............................ 29

4. Lennar Is Incapable of Demonstrating Prejudice ........................................... 29

V.     CONCLUSION ............................................................................................................ 31

CERTIFICATE OF SERVICE ......................................................................................... 32

LOWE GRAHAM JONES PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1

## TABLE OF AUTHORITIES

2

3

**Cases**

*Adidas Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029(D. Or. 2008) ..................... 24

*AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943 (N.D. Cal. 2015) ................................................ 24

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) ....................................................... 16

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903 (Fed. Cir. 1984) .............................. 22

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) ............................................................. 21

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ............... 18

*Byrd v. Blue Ridge Cooperative*, 356 U.S. 525 (1958) ................................................................. 21

*Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307 (11th Cir. 1999) ............. 18

*Cornelius v. DeLuca*, 709 F. Supp. 2d 1003 (D. Idaho 2010) ..................................................... 26

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962) ....................................................................... 20

*Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959) ................................ 28

*E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 472 (N.D. Cal. 1992) ............. 23

*E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604 (9th Cir. 1983) ............................................. 18, 27

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829 (9th Cir. 2014) ............ 20

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015) ...................... 22

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2000) .......................... 29

*In re Beaty*, 306 F.3d 914 (9th Cir. 2002) ................................................................................... 29

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002) .............................. 25

*Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998 (9th Cir.2004) ................................... 19

*Johanna Farms, Inc. v. Citrus Bowl*, Inc., 468 F. Supp. 866 (E.D.N.Y. 1978) ........................... 27

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFF'S TRIAL BRIEF - 4
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES ᴾˡˡᶜ

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

*Karoun Dairies, Inc. v. Karlacti, Inc.,* No. 08cv1521 AJB (WVG), 2014 U.S. Dist. LEXIS 92723 (S.D. Cal. July 8, 2014) ................................................................................ 26

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867 (9th Cir. 2014) ........... 27, 28

*Lahoti v. Vericheck, Inc.*, 708 F. Supp. 2d 1150 (W.D. Wash. 2010) ......................................... 16

*Lee Pharm. v. Mishler*, 526 F.2d 1115 (2d Cir. 1975) ................................................................. 20

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir.1993) ........................................... 20, 22

*Love v. Assoc. Newspapers, Ltd.*, 611 F.3d 601 (9th Cir. 2010) ................................................. 26

*Matzger v. Vinikow*, 17 F.2d 581 (9th Cir. 1927) ........................................................................ 29

*May Dep't Stores Co. v. Prince*, 200 U.S.P.Q. 803 (T.T.A.B.1978) ........................................... 18

*N. Star Steel Co. v. Thomas,* 515 U.S. 29 (1995) ....................................................................... 25

*National Lead Co. v. Wolfe*, 223 F.2d 195 (9th Cir. 1955) ......................................................... 29

*Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383 (3d Cir.1985) ...................... 18

*Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385 (9th Cir. 1993) ............................................. 18

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132 (9th Cir.1986) ...................................... 20

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945) ....................... 29

*R&R Partners, Inc. v. Tovar,* No. 03:04-CV-00145-LRH-PAL, 2007 U.S. Dist. LEXIS 29819 (D. Nev. Apr. 23, 2007) ................................................................................... 21

*Razor USA LLC v. Vizio, Inc.*, No. CV 14-01586 SJO (JCGx), 2015 U.S. Dist. LEXIS 182156 (C.D. Cal. Oct. 19, 2015) .................................................................... 22

*Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455 (4th Cir. 1996)). ......................................... 28

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977) ................................................................................................................. 20

*Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) ............................................. 19

LOWE GRAHAM JONES ₚₗₗₒ

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*, --- F.3d ---, 2017 WL 2951672 (9th Cir. July 11, 2017) ........................................................................................................................ 21

*Swofford v. B & W, Inc.*, 336 F.2d 406 (5th Cir. 1964) ............................................................ 20

*Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n,* 465 F.3d 1102 (9th Cir. 2006) ................................................................................................................................................... 28

*Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609 (7th Cir. 1965) .................................... 29

**Statutes**

15 U.S.C. § 1117.......................................................................................................................... 20

**Other Authorities**

Ninth Circuit's Model Jury Instructions § 15.29 ........................................................................ 21

**Treatises**

4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:20 (4th ed. 2014) .......................................................................................................................................... 16

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). .................................................... 26

**Constitutional Provisions**

U.S. CONSTITUTION, ARTICLE IV, SECTION 1 ............................................................................... 25

LOWE GRAHAM JONES ᴾᴸᴸᶜ

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

# I.  INTRODUCTION

This case is about the likelihood of consumer confusion between Plaintiff iShow.com ("iShow")'s use of "NEXTGEN" with that of Defendants Lennar Corporation and Lennar Pacific Properties Management, Inc. (collectively "Lennar"). The facts will show that iShow began using the NEXTGEN mark for demonstration homes at least as early as 2003 to indicate iShow as the source of premiere residential housing features. iShow sought to create a top-of-the-line, premiere quality surrounding the NEXTGEN brand, thus iShow needed to carefully manage the evolution of its reputation. In order for the NEXTGEN brand to mean anything to end-consumers, and consequently to builders and contractors, iShow imposed the strictest standards upon its partners in order for them to truthfully call themselves "NextGen." From 2003 until 2011, iShow invested millions of dollars into its brand, entered into partnerships with contractors, presented at high-profile trade shows, and built homes across the country. Even if the jury should find that NEXTGEN is a descriptive mark for iShow's services, it will see substantial evidence that the mark has acquired distinctiveness during this time period. The facts will show that Lennar carefully monitored iShow's growth and success, and then decided to willfully capitalize on that developed reputation.

In late 2011 Lennar filed an application for its own trademark for NEXT GEN in the related services within International Class 037: "developing, laying out and constructing residential communities and individual residences." *See* Lennar Answer, Dkt. 27, pp. 13-14. iShow attempted to prevent the issuance of this registration in March 2012, but needed to withdraw its opposition in August 2012 to conserve its resources to fight Lennar in U.S. District Court: where it could obtain damages and injunctive relief.

PLAINTIFF'S TRIAL BRIEF - 7
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES ᴾᴸᴸᶜ

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 ● F: 206.381.3301

1    iShow will demonstrate that its delay in filing suit was exacerbated by Lennar's willful

2    infringement of the NEXTGEN mark. From 2012 to 2015, Lennar used NEXT GEN willfully on

3    homes. Knowing that iShow was financially hindered, Lennar continued to damage the reputation

4    iShow spent over eight years building. iShow was already financially disadvantaged due to

5    participating the opposition proceedings while managing its recovery from the 2007-2009 housing

6    crisis and slow recovery. Lennar's infringement was yet another scourge. While iShow is only

7    obligated to show Lennar's revenues, the facts will show that Lennar profited handsomely from

8    its willful infringement, and enjoyed high profit margins on its NEXT GEN line of homes.

9
       Attempting to effectively eradicate iShow, Lennar continued to expand its use of NEXT
10
     GEN in residential construction. Indeed, any delay in filing suit was not only exacerbated by
11
     Lennar, but also enabled Lennar to continually encroach on iShow's use of NEXTGEN.
12
     Consequently, Lennar will not be able to show prejudice from iShow's supposed delay. The
13
     dispute came to a head on February 4, 2015 when Lennar sent iShow a cease-and-desist letter,
14
     forcing iShow to file for declaratory relief.
15

16                                    **II.  RELEVANT FACTS**

17
       **A.    iShow's Early Years**
18

19       Founded in 1999, iShow's original business involved services in the fields of streaming

20   media, video content creation, and website development. *See* Declaration of Paul Barnett in

21   Support of iShow's Motion for Summary Judgment, Dkt. 32, (hereinafter "Barnett Decl.") ¶ 2.

22   iShow created a series of online streaming videos for the well-known home remodeler and TV

23   personality Bob Vila. Further, iShow and Bob Vila collaborated on two projects, the "DotCOM

24

PLAINTIFF'S TRIAL BRIEF - 8
Civil Action No. 2:15-cv-01550

Dream Home" and the "EnergyWise House." *Id.* In 2001 and 2002, iShow won two contracts from the State of California to create educational videos with supporting websites used to train building inspectors and architects in best-practices for design and building-code inspection. *Id.* at ¶ 3.

iShow's first media projects in the home-remodel and building industry led to a separate business, one focused on the design and construction of "demonstration homes" for exhibition at a trade show or like event. iShow build its first demonstration home at the Stardust hotel in Las Vegas, Nevada in 2003. *See id.* at ¶ 4 and Dkt. 32-1 at ISOW000029-34; and 51.

## B.   iShow's Continued Growth into Residential Homes

### 1.   iShow Developed Its Core Business Around Building Demonstration Homes

The 2003 Las Vegas home was viewed by numerous interstate travelers who attended the International Builders Show (IBS) and the Consumer Electronics Show (CES). *Id.* This home was built to show off the most advanced building techniques and state-of-the art technologies, and was held out to ordinary consumers as "[t]he convergence of connected home technology, residential building science and energy efficient design." *See id.*, Dkt. 31-1, at ISOW000020. *See also* ISOW000001. An extensive advertising, public relations, and marketing plan was prepared and executed in order to build brand awareness. *See id.* at ISOW000036-38; and 58-59. *See also* Barnett Decl. ¶¶ 5-8. This publicity led to press coverage of iShow's NEXTGEN home by others. *See id.* ¶ 4 and Dkt. 32-1 at ISOW000062. This 2003 home was more than a publicity stunt. It earned revenue for iShow in the form of paid sponsorships from a variety of companies in the residential design and construction industries, including architects, builders, building-products manufacturers, and makers of advanced home-technologies, among others. *See* Barnett Decl. ¶ 5 and Dkt. 31-1 at ISOW000024-28; 61; 84; 87; 90; 101; and 106. Some sponsors advertised or

LOWE GRAHAM JONES℠

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1   promoted the fact that they were selected by iShow for inclusion into the 2003 NEXTGEN Home.

2   See id. at ISOW000010.

3

4       iShow continued to grow upon its successful 2003 demonstration. In 2004, iShow built

5   another demonstration home at IBS. *See* Barnett Decl. at ¶ 9 and Dkt. 32-2 at ISOW001405; 2358;

    1398-1401; 1413-1414; and 194. iShow's extensive use and notoriety in demonstration homes was

6   outlined in support of its Motion for Summary Judgement, and is expressly incorporated by

7   reference and need not be repeated here. *See* Dkts. 32-1 through 32-17. iShow's NEXTGEN homes

8   built for demonstration were later donated or sometimes sold at cost to others who later moved the

9   homes to various locations around the country. *See* Barnett Decl. at ¶ 25 and Dkt. 32-18. Thus,

10  dozens of NEXTGEN homes sold or donated since 2003 have been occupied by home owners

11  living in various parts of the country. *See id.* Dkt. 32-19.

12

13      Since 2004, over 200,000 people have toured NEXTGEN demonstration homes at various

14  tradeshows across the country and at locations where the homes have been built onsite. *See id.* at

15  ¶ 31. Millions have seen iShow's NEXTGEN homes at trade shows and in publications related to

16  tradeshows. They have been variously, home buyers, builders, contractors, architects, and others

17  interested in advanced building designs, techniques, and home-technologies. *See id.* Moreover,

18  iShow's NEXTGEN demonstration homes have had over 100 million media impressions since

19  2004. *See id.* The facts will show that consumers, builders, and contractors alike have grown to

20  associate iShow's NEXTGEN mark with top-of-the-line residential construction.

21

        **2.   iShow Has Expanded Beyond Demonstration Homes Since 2003**

22      For each NEXTGEN demonstration home, iShow has partnered with a builder, and in many

23  cases, that builder has been permitted to use the name NEXTGEN or to otherwise advertise its

24

PLAINTIFF'S TRIAL BRIEF - 10
Civil Action No. 2:15-cv-01550

affiliation with NEXTGEN. *See* Dkt. 32 at ¶ 34 and Dkt. 32-36 at ISOW002572 (identifying Genesis as a NEXTGEN "official builder"). *See also* Dkt. 32-36 at ISOW001949; ISOW002175-2176; ISOW002177-78; ISOW007406-7408; ISOW004394-4395; ISOW008001; ISOW008017; ISOW006342; ISOW001429; and ISOW000308. Thus, several builders have held themselves out to ordinary consumers as builders affiliated with the NEXTGEN brand.

Taking at least one of these relationships further, in 2006, iShow collaborated with a builder, Brownstone & Associates ("Brownstone"), to offer a "NEXTGEN Certified planned community" at Port de la Mer, Florida. *See id.* at Dkt. 32-24 at ISOW001326; 3831-3835; and 3867; *see also* Declaration of James Brown, Dkt. 33, (hereinafter "Brown Decl.") Dkts. 33-1 through 33-6; Barnett Decl. Dkt. 32-16 at ISOW001808. According to the terms of iShow's deal with Brownstone, Brownstone agreed to pay 1% of sales into a joint venture, co-owned by Brownstone and iShow. *See* Dkt.32 ¶ 32; Dkt. 32-24 at ISOW003836-3838.  Ultimately, iShow's partnership with Brownstone only resulted in a single NEXTGEN home built onsite. Brown Decl. at ¶ 13. The national housing crisis led to the demise of iShow's joint venture with Brownstone, *see id.* at ¶ 12, however, Brownstone continued to offer NEXTGEN certified home plans on its website into 2012. *See* Dkt. 32-24. at ISOW003873. Further, industry press coverage of iShow's partnership with Brownstone created a lasting public record of the venture. *See id.* at ISOW001800-1802; and 3842-3845.

After Brownstone, iShow continued to offer opportunities for builders to become "Certified NextGen Builders." *See id.* at Dkt. 32-25. In 2007, iShow entered discussions with D.R. Horton, one of the largest builders in the U.S. *See id.* at ISOW004564-4565. While these discussions were advanced, a draft agreement was prepared but never executed, *see id.* at

LOWE GRAHAM JONES™

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

ISOW005126-5137, again due to the continuing housing crisis in the U.S. *See id.* at ¶ 33. iShow continued to advertise the opportunity for certified or "approved" NEXTGEN Builders through the recession years of 2007-2012. *See id.* at ¶ 34 and Dkt. 32-26 (including archived web pages from www.nextgenhomes.com 2007-2012).

In 2007, iShow built a NEXTGEN "First to the Future" home in Seattle, WA. *See* Dkt. 32 ¶ 27; Dkt. 32-20. This home was named "Residential Concrete ICF Home of the Year" in 2008 by a Washington State concrete industry trade group. *See id.* at ISOW006716 and ISOW006717.

iShow has even acted as its own developer. In 2007, iShow purchased a parcel of land in Las Vegas, Nevada, (through a wholly owned subsidiary, NEXTGEN HOME 09, LLC) and began construction of a NEXTGEN home on that parcel in 2008. *See* Dkt. 32 ¶ 30; Dkt. 32-23 In 2009, after construction was complete, this home was awarded with the Department of Energy's "Builder Challenge Rating" for exceeding energy efficiency standards by more than 51% compared to other newly constructed homes of the time. *See id.* at ISOW004507.

### 3. iShow's Growth in 2011 and Beyond

iShow's NEXTGEN collaborations to offer homes directly to consumers included architects as well as builders. In 2011, iShow collaborated with architect Mike Rosen of Martin Architectural Group on a project to design a new series of NEXTGEN homes, called the NEXTGEN "Companion Home Series," a series of homes targeted to multi-generational home owners. *See* Dkt. 32-25 at ISOW004549-4550 and 4553. For example, retirees who wish to have their aging parents live with them. The NEXTGEN "Companion Home Series" debuted in February 2012 at IBS in Orlando, Florida. *See* Dkt. 32-10 at ISOW000564; 4391; and 4397. Architect, Mike Rosen, also presented the NEXTGEN Companion Home Series to the National

Association of Home Builders (NAHB) through that organization's architectural council. *See* Dkt. 32-25 at ISOW002245-2262.

iShow built ***another*** NEXTGEN "First to the Future" home in Florida in 2013. *See* Dkt. 32 ¶ 28; Dkt. 32-21. This home was produced in partnership with well-known television personality, Ty Pennington. *See id.* at ISOW006540. Ty Pennington and iShow have partnered on several more home projects, including NEXTGEN's "A House United" that was built in halves in 2012, one half at the Republican National Convention and the other at the Democratic National Convention. *See* Dkt. 32-22.

In 2013, iShow began discussions with Anderson Homes. *See,* Dkt. 32 ¶ 33; Dkt. 32-25 at ISOW005184-5188. The prospective Anderson partnership never materialized, but in 2016, iShow signed an agreement with Palm West Home Builders, Inc. to offer "Approved NEXTGEN" Homes directly to consumers. *See id.* at ISOW005322 and ISOW005401.

Further, since 2003 iShow has continually maintained online streaming video content showcasing various NEXTGEN homes on its websites, www.ishow.com and www.nextgenhome.com. *See* Dkt. 32 at ¶ 35 and Dkt. 32-27. In 2013, iShow launched "NEXTGEN Home TV," a streaming media network available online and directed at the residential design, construction, and remodel markets (website available at www.NGHTV.com). *See id.* at ¶ 36 and Dkt. 32-28. The NGHTV network offers an array of programs, all focused on different NEXTGEN home experiences. For example, the series showcasing the NEXTGEN "First to Future" home with Ty Pennington, the "House United" series, and the "Your House & Home" series collectively reached over 240 million viewers. *See id.* at ¶ 37. The "Your House & Home" series has also been on syndicated cable television. *See id.*

LOWE GRAHAM JONES﹖﹖﹖

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1

2

### C.   Lennar's Knowledge of The NEXTGEN Brand

3

4       The facts will show that Lennar monitored iShow's development of the NEXTGEN brand.

5  As Mr. Barnet previously testified, at least twenty-two different Lennar employees visited iShow's

6  demonstrations at IBS from 2004 to 2012. *See* Dkt. 32 ¶ 40. This included Regional President Jeff

7  Roos, and Vice President of Operations Jeff Johnson: two high-ranking officials at Lennar. *Id.* It

8  is also probable that some or all of these twenty-two Lennar employees viewed some of iShow's

9  video content and monitored the development of the NEXTGEN brand through additional avenues.

10 When Mr. Barnett met with Mr. Roos in 2011, discussed below, Mr. Barnett disclosed additional

11 information about the NEXTGEN brand, as well as iShow's planned uses for the mark.

### D.   Lennar's Initial Use of NEXT GEN and iShow's Opposition

12

13      Lennar alleges its use of the mark NEXT GEN began sometime in late 2011 or early 2012.

14 *See* Dkt. No. 27 at Counterclaim ¶ 5. According to Lennar, "[s]ince receiving the trademarks in

15 2012, Lennar has constructed hundreds of NEXT GEN homes and has spent substantial monies

16 marketing the NEXT GEN marks." *Id.* Lennar's federal registrations claim a first use of October

17 28, 2011, *see id.* at Dkt. 27-1, however, the specimens of use filed with the USPTO only include

18 dates from 2012. *See* Barnett Decl.¶ 38; Dkt. 32-29. As shown on the face of Lennar's registration

19 for "NEXT GEN," the primary focus of its registration was real estate management and brokering

20 services, financial services, insurance and mortgage banking. Dkt. 27-1.

21      To investigate the potential infringement of iShow's rights in NEXTGEN, Mr. Barnett sent

22 Lennar an email on September 16, 2011. *See,* Dkt. 45 ¶ 2. Mr. Barnett attempted to resolve any

23 potential dispute and met with Lennar Regional President Mr. Jeff Roos personally later that

24

PLAINTIFF'S TRIAL BRIEF - 14
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES ᴾᴸᴸᶜ

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1   month. *Id.* at ¶ 3. Mr. Barnett made Mr. Roos aware of iShow's business and plans for expansion,

2   and Mr. Roos confirmed Lennar's awareness of iShow's history. *Id.* at ¶¶ 4-6.

3       Out of an abundance of caution, iShow filed its notice of opposition in March 2012. *See*

4   Dkt. No. 7-2 at 4/18. The jury will hear evidence proving that Lennar's adoption of NEXT GEN

5   did not happen overnight. iShow voiced its objection to Lennar's use of NEXT GEN, but its

6   strained resources forced iShow to withdraw its opposition. Seeing iShow as a financially

7   disadvantaged obstacle, Lennar took the calculated risk of infringement because it had the

8   resources to do so.

9

10      **E.   Lennar's National Expansion and Resulting Profit**

11      The facts will show that Lennar seized on the opportunity to trade off of the goodwill iShow

12   built in the NEXTGEN mark. After Mr. Barnett's meeting with Mr. Roos, Lennar had a clear

13   understanding of iShow's direction, whereas iShow was left hypothesize as to Lennar's plans. The

14   facts will show that Lennar progressively expanded its use of "NEXT GEN" to be directly

15   competitive with iShow in residential construction and design services. At minimum, Mr. Roos as

16   well as any other ordinary consumer would believe that iShow's continued expansion would be

17   likely for a company in the business of building and designing homes.

18      Lennar's own sales records will demonstrate that its successful misappropriation of the

19   NEXTGEN brand began in a handful of states, but eventually progressed on a national level over

20   the course of several years. When Lennar wrote NEXTGEN a cease and desist letter on February

21   4, 2015, see Dkt. No. 26-1, its motives became abundantly clear and iShow was forced to seek a

22   declaration from this Court to clarify the scope of its rights.

23

24

PLAINTIFF'S TRIAL BRIEF - 15
Civil Action No. 2:15-cv-01550

### III.   ARGUMENT IN SUPPORT OF iSHOW'S CLAIMS

The jury will be instructed on all likelihood of confusion factors. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). However a core issue will be the relatedness of the Parties' respective uses. Indeed, Professor McCarthy has remarked that the "zone of natural expansion" doctrine is "an unnecessarily complicated application of the likelihood of confusion of source or sponsorship test to a particular factual situation." 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:20 (4th ed. 2014). The facts will show that Lennar's use of NEXT GEN in residential construction and real estate services is sufficiently "related" iShow's use of NEXTGEN in connection with residential construction and demonstration homes. There is no requirement that the services be identical, and the extent that the jury will deem iShow's and Lennar's respective services to be dissimilar, it will see ample support for the notion that iShow's expansion into residential construction services to be "natural" in 2011.

### A.    The Jury Can Reasonably Find that NEXTGEN Is Suggestive

The NEXTGEN mark, as used by iShow is strong. The mark NEXTGEN is suggestive and not descriptive because it has no common English meaning and it does not immediately convey information about the nature of iShow's goods or services either in whole or in part, "such understanding requires imagination or a mental leap by the consumer, in order to become apparent." *Lahoti v. Vericheck, Inc.*, 708 F. Supp. 2d 1150, 1162 (W.D. Wash. 2010) (finding composite mark VERICHECK inherently distinctive for electronic payment transaction processing services) *affirmed*, 636 F.3d 501 (9th Cir. 2011). It would be reasonable for the jury conclude that "NEXTGEN" requires some mental leap to imagine the most cutting-edge and

environmentally-friendly residential construction and design services. Simply put, a consumer does not go to a store and buy a "NEXTGEN."

B. **The Jury Can Reasonably Find that NEXTGEN Acquired Distinctiveness by the Time Lennar Entered the Marketplace**

As noted above, Lennar's specimen filed with the Trademark Office does not show use in 2011. Further, Mr. Roos informed Mr. Barnett that Lennar was planning on using the NEXTGEN mark in a manner different from iShow. Thus, the timing of Lennar's adoption of the NEXTGEN mark will need to be addressed by the jury.

Assuming *arguendo* that Lennar will demonstrate its use began in late 2011, and assuming the jury will deem the NEXTGEN mark descriptive, iShow will put forth facts demonstrating it acquired distinctiveness in the NEXTGEN brand from 2003 through 2011. As noted above, from 2003 onward iShow continually used NEXTGEN in connection with top-of-the-line homes to showcase cutting-edge building techniques and technologies. Again, every home built was done in collaboration with builders across the country. Further, the jury will see evidence that beginning in 2006, iShow had concrete plans to build neighborhoods, and had purchased parcels of land. Nearly every single home iShow has built has been occupied by home-owners – either through sale or donation. The evidence will show that iShow has never limited itself to strictly advertising and marketing services.

iShow will also put forth evidence of its expenditures and efforts to expand the NEXTGEN brand. Like a certification mark for "Organic" or "Fair Trade" or "Kosher," iShow's prime business model centered on the value of the NEXTGEN brand. Since 2003, iShow has invested millions of dollars in advertising expenditures, pursuing licensing agreements, television deals,

LOWE GRAHAM JONES™

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

and online content. The evidence will also show widespread media coverage of the iShow's NEXTGEN homes and designs. Evidence of these expenditures are directly relevant to the strength of the NEXTGEN mark, as well as Lennar's claim for laches. *See E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).

## C.   The Jury Will Find the Parties' Respective Uses to be Related

A central issue will be the zone of expansion or "related goods" factor as outlined by the Ninth Circuit. *See e.g., Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999) ("Even though Brookfield's computer software and West Coast's offerings on its web site are not identical products, likelihood of confusion can still result where, for example, there is a likelihood of expansion in product lines.") (citing *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993)); *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1310 (11th Cir. 1999). *See also Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1406 (3d Cir.1985) ("Once one has established a common law trademark in a product, the prior use of that trademark will apply as well to the use of the same trademark on related products in ascertaining priority of use." (emphasis omitted)), *cert. denied*, 474 U.S. 920, 106 S. Ct. 249, 88 L. Ed. 2d 257 (1985); *May Dep't Stores Co. v. Prince*, 200 U.S.P.Q. 803, 808-09 (T.T.A.B.1978) (senior user possesses rights in mark superior to those of "a subsequent user of the same or a similar mark for any goods which purchasers might reasonably be likely to assume emanate from [senior user] in the normal expansion of its business under the mark notwithstanding that the expansion to a particular product might be subsequent in time to that of another party").

The jury will find that iShow's prior use of the NEXTGEN mark in connection with demonstration homes is sufficiently "related" to Lennar's uses, such that Lennar's uses of the mark

PLAINTIFF'S TRIAL BRIEF - 18
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES ᴾᴸᴸᶜ

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1   NEXT GEN is likely to cause confusion as to the source, origin, or sponsorship of Lennar's goods

2   or services. Further, the facts will also show that Lennar's continuous monitoring of iShow

3   informed its decision to pluck the NEXTGEN brand after the brand had sufficiently developed

4   into a valuable asset. Additionally, Mr. Barnett's meeting with Mr. Roos in 2011 gave Lennar a

5   roadmap for iShow's expansion plans to aid in its misappropriation.

6

7   **D.   iShow Will Prove It Is Entitled to Lennar's Profits**

8          ***1.   The Evidence Will Support an Award of Lost Profits***

9          "[D]isgorgement of profits is a traditional trademark remedy," *Jerry's Famous Deli, Inc.*

10   *v. Papanicolaou,* 383 F.3d 998, 1004-05 (9th Cir.2004) (describing remedy, in enforcement of

11   trademark injunction case, as "akin to an award of the infringer's profits under trademark law" and

12   noting "[u]nder established law, once gross profits related to the infringement are established,

13   [infringer] has the burden of documenting any legitimate offsets"). "In reviewing an award of lost

14   profits, we do not ask whether the substance of the evidence presented to the jury was correct or

15   even credible; we only ascertain whether the award was based on reasonable inferences and fair

16   assessments of the evidence in the record." *Skydive Ariz., Inc. v. Quattrocchi,* 673 F.3d 1105, 1113

17   (9th Cir. 2012) (citations omitted).

18          In determining whether profits are recoverable under 15 U.S.C. § 1117(a), iShow can rest

19   its case on proof of gross profit associated with infringing use of the mark. That amount, at least

20   through August 2015, has been stipulated as exceeding $1.77 billion in the Proposed Pretrial Order.

21   *See* Dkt. 92, p.5 ¶ 18. And while under the statute it is not iShow's burden to establish deductible

22   expenses, documents produced in discovery by Lennar show a net profit on these sales of over

23   $488 Million. Defendants have agreed to supplement their disclosure of these figures from August

24

PLAINTIFF'S TRIAL BRIEF - 19
Civil Action No. 2:15-cv-01550

2015 through time of trial, and this supplementation will be provided to the jury. In short, it is Lennar who must prove what portion of these profits attributable to factors other than the infringement. And that in the absence of such proof of deduction, the jury is free to award all of the profit. *See e.g., Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405-1408 (9th Cir.1993) (holding that when infringing and non-infringing elements of work cannot be readily separated, all of defendant's profits should be awarded to plaintiff); *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 843 (9th Cir. 2014) ("The Lanham Act applies this burden-shifting framework to proof of the defendant infringer's lost profits."); *Polo Fashions, Inc. v. Dick Bruhn, Inc.,* 793 F.2d 1132, 1135 (9th Cir.1986) (awarding receipts from sales pursuant to 15 U.S.C. § 1117(a)).

### 2.   *Willfulness and Disgorgement Is Unsettled*

The Seventh Amendment guarantees a right to a jury in a case for trademark infringement. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) (finding a Seventh Amendment right to jury trial in action for trademark infringement); *see also Lee Pharm. v. Mishler*, 526 F.2d 1115, 1117 (2d Cir. 1975) (per curiam). The parties each seek monetary recovery in the form of actual damages and profits attributable to the infringement pursuant to 15 U.S.C. § 1117(a). *See* Dkt. Nos. 26 and 27.

The Ninth Circuit has held that a damages award under the Lanham Act demands a finding from the jury. *See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977) (finding that where a plaintiff's request for a copyright infringer's profits was "'basically a money claim for damages,'" a jury right existed under *Dairy Queen* (quoting *Swofford v. B & W, Inc.*, 336 F.2d 406, 411 (5th Cir. 1964) (same in patent infringement context))).

PLAINTIFF'S TRIAL BRIEF - 20
Civil Action No. 2:15-cv-01550

1    Regardless, it is well-settled that the presence of equitable claims does not undermine the

2    right to a jury trial of a legal claim in the same case. *See Beacon Theatres, Inc. v. Westover*, 359

3    U.S. 500, 510-511 (1959). Further, in unsettled issues of law, "the federal policy favoring jury

4    decisions of disputed fact questions," *Byrd v. Blue Ridge Cooperative*, 356 U.S. 525, 538 (1958),

5    courts should "resolve any doubts in favor of the right to a jury trial." *Lee Pharm. v. Mishler*, 526

6    F.2d 1115, 1117 (2nd Cir. 1975). Courts in the Ninth Circuit routinely submit the question of

7    profits due under § 1117 to the jury. *See e.g., Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105,

8    1113 (9th Cir. 2012).

9    iShow takes exception to the unpublished Ninth Circuit decision, *Stone Creek, Inc. v.*

10   *Omnia Italian Design, Inc.*, --- F.3d ---, 2017 WL 2951672, at *1, *11 (9th Cir. July 11, 2017).

11   iShow submits that willfulness is ***not*** a prerequisite to proving disgorgement of profits under the

12   Lanham Act.  The analysis from *R&R Partners*, citing an apparent circuit split, adopted the

13   rationale from the Fifth and Third Circuits as particularly instructive: "…a 1999 amendment to

14   Section 1117 replaced 'or a violation under section 43(a)' with 'a violation under section 43(a), or

15   a willful violation under section 43(c) … The plain language of this amendment indicates that

16   Congress intended to condition monetary awards for Section 43(c) violations on a finding of

17   willfulness, but not Section 43(a) violations." *R&R Partners, Inc. v. Tovar,* No. 03:04-CV-00145-

18   LRH-PAL, 2007 U.S. Dist. LEXIS 29819, at *4-5 (D. Nev. Apr. 23, 2007) (citations and

19   quotations omitted). This circuit split is also noted in the Ninth Circuit's Model Jury Instructions.

20   *See id.* at § 15.29 (Comment: "…other circuits are divided on, whether willfulness remained a

21   prerequisite to disgorgement of a defendant's profits as a result of the Trademark Amendments

22   Act of 1999"), available at http://www3.ce9.uscourts.gov/jury-instructions/node/254, last

23   reviewed July 19, 2017.

24

PLAINTIFF'S TRIAL BRIEF - 21
Civil Action No. 2:15-cv-01550

### 3.   *Disgorgement of Profits Can Serve as a Proxy for Actual Damages*

Even though this Court ruled that iShow "will not be permitted to offer evidence of actual damages" (Dkt. 93, p. 7), iShow's ***claim*** for actual damages has not been dismissed in this case. Lennar's lost profits can therefore serve as an appropriate measure for actual damages. Thus, regardless of *Stone Creek,* "[b]ecause proof of actual damages is difficult, a court may award damages based on defendant's profits on the theory of unjust enrichment." *Lindy Pen Co.* 982 F.2d at 1407 (citations omitted). In *Lindy Pen,* the plaintiff failed to put forth a sufficient calculation of its damages. *Id.* Nonetheless, the district court in *Lindy Pen* considered the plaintiff's evidence of the defendant's profits under an unjust enrichment theory – despite finding a lack of willful infringement. *Compare id.* at 1046 *with id.* at 1408. Additionally, Lennar's own cited authority directs a finding that willfulness is not necessary to support an award of profits. *Razor USA LLC v. Vizio, Inc.*, No. CV 14-01586 SJO (JCGx), 2015 U.S. Dist. LEXIS 182156, at *14 (C.D. Cal. Oct. 19, 2015) ("As for profits, Razor could receive Vizio's profits as either a restitutionary remedy or as a compensatory remedy. The law only requires a showing of willfulness in the former circumstances.").

In awarding damages under the Lanham Act, "the court must fashion a remedy wherein the defendant may 'not retain the fruits, if any, of unauthorized trademark use or continue that use [and the] plaintiff is not . . . [given] a windfall.'" *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,* 778 F.3d 1059, 1073 (9th Cir. 2015) (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc*., 750 F.2d 903, 918 (Fed. Cir. 1984)). Lennar's claim for actual damages is still at bar, and Lennar's profits, tentatively estimated at over $488 Million, are an appropriate measure of the same.

### E.   iShow Will Prove that Lennar's Infringement Is Willful

LOWE GRAHAM JONES᷄
701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1    The evidence will show that Lennar's repeated, **_personal_** visits to the IBS NEXTGEN

2   homes over the course of a decade and its general awareness of the NEXTGEN brand informed its

3   decision to deliberately poach the good will developed by iShow. Additionally, the jury will learn

4   that Mr. Roos no doubt learned about iShow's **_future plans_** for the NEXTGEN mark when he met

5   Mr. Barnett in September 2011. This meeting alone will also support a finding of willfulness. *See*

6   *e.g., E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F. Supp. 472, 475 (N.D. Cal. 1992)

7   ("Use of an infringing mark, in the face of warnings about potential infringement, is strong

8   evidence of willful infringement."). Contrary to Lennar's assertions the Proposed Pretrial Order

9   (Dkt. 92, p. 15), iShow was not required to assert a claim of willfulness as a standalone allegation.

10  Lennar's cited authority does not hold otherwise. If this were true, then Lennar should have moved

11  for appropriate relief under Fed. R. Civ. Pr. 12.

## IV.  ARGUMENT OPPOSING LENNAR'S DEFENSES

### A.   Lennar Has Waived Its Right to Assert Affirmative Defenses Not Plead In Its Amended Answer

It is an axiom of civil procedure that affirmative defenses must be asserted in an answer or

they are forever waived. In its Amended Answer and Counterclaims (Dkt. 27, p. 5), Lennar

asserted four affirmative defenses.[1] It is unclear whether Lennar will seek the defense of fair use,

for it has included that as a possibility in recent drafts of pretrial statements. In any case, Lennar

---

[1] The Fourth Affirmative Defense was merely a reservation to assert an additional defense at a later date.

PLAINTIFF'S TRIAL BRIEF - 23
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES℠

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

has inserted the additional defense of "acquiescence," which was not plead in its Amended Answer and Counterclaims. *See,* Proposed Pretrial Order, Dkt. 92 at p. 2 ¶ 3 (inserting "by acquiescence"). While this may be an issue better suited for post-trial motions, iShow renews its objection to any attempt by Lennar to put forth a defense of acquiescence, or any other affirmative defense that should have been plead.

Acquiescence is a distinct affirmative defense. *See e.g., AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 956 (N.D. Cal. 2015) (referring to acquiescence as separately-plead affirmative defense). "Estoppel by acquiescence includes the two elements of laches--(1) plaintiff's unreasonable and inexcusable delay, (2) inducing the belief that it has abandoned its claim against the infringer--and adds (3) affirmative conduct inducing the belief that it has abandoned its claim against the alleged infringer, and (4) detrimental reliance by infringer." *Adidas Am., Inc. v. Payless Shoesource, Inc.,* 546 F. Supp. 2d 1029, 1075 (D. Or. 2008)(citations omitted). "The distinguishing feature of the acquiescence defense is the element of ***active*** or ***explicit*** consent to the use of an allegedly infringing mark." *Id.* (citations omitted) (emphasis in original);

Courts have routinely found that affirmative defenses of fair use and acquiescence must be plead. *See e.g., Zest IP Holdings, Ltd. Liab. Co. v. Implant Direct Mfg. Ltd. Liab. Co.,* No. 10cv541-GPC (WVG), 2015 U.S. Dist. LEXIS 46817, at *64-65 (S.D. Cal. Feb. 3, 2015) ("Implant Direct/IDSI must still have raised the defense as an affirmative defense."); *Cal. Brewing Co. v. 3 Daughters Brewing Ltd. Liab. Co.,* No. 2:15-cv-02278-KJM-CMK, 2016 U.S. Dist. LEXIS 97614, at *8 (E.D. Cal. July 25, 2016)( "To establish an acquiescence defense, a defendant must plead… [elements]"); *Wagner Electric Corp v. Raygo Wagner Inc.* 192 USPQ 33, 44 n. 13 (TTAB 1976 (holding that applicant's defense of laches and acquiescence were waived because they were not

LOWE GRAHAM JONES ᴾᴸᴸᶜ

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

pleaded as affirmative defenses to opposer's claim). As acquiescence requires a ***distinct finding*** of an active representation, as opposed to mere silence, and is considered to be a distinct affirmative defense Lennar was required to plead it separately. It cannot at this late stage make this an issue after the conclusion of motions *in limine* and dispositive motions.

**B.   This Court Already Rejected Lennar's Defense of Issue Preclusion and Rule 12(b)(6) Arguments**

This Court ruled that it would not entertain Lennar's motion to dismiss on this basis because "could have and should have raised this issue long ago." Dkt. 85, p. 2. Lennar's defense of issue preclusion is therefore not in the case and should not be entertained. Likewise, Lennar's argument that willfulness should have been plead, *see* Dkt. 92, p. 15, is not only substantively unsupported, it is well beyond the dispositive motions deadline and should be ignored.

**C.   A Choice of Law Analysis Warrants The Use of Nevada's Four-Year Statute of Limitations**

iShow asserts that should this Court consider Lennar's laches defense, that a proper conflicts of laws analysis will determine that Nevada's four-year statute limitations applies. This analysis is required to satisfy the U.S. CONSTITUTION, ARTICLE IV, SECTION 1. *See e.g., Cruz v. United States,* 387 F. Supp. 2d 1057, 1071 (N.D. Cal. 2005) (applying a federal statute of limitations).  No case cited by Lennar has conducted a conflict of law analysis. A district court must borrow from the "closely analogous state law" And here, that state is unquestionably Nevada. *N. Star Steel Co. v. Thomas,* 515 U.S. 29, 31 (1995); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 836 (9th Cir. 2002).

PLAINTIFF'S TRIAL BRIEF - 25
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES℠

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 ◆ F: 206.381.3301

1      Under a conflict-of-law analysis, Nevada's four-year statute of limitations applies. Federal

2  courts must apply the forum state's choice of law rules. *Love v. Assoc. Newspapers, Ltd.*, 611 F.3d

3  601, 610 (9th Cir. 2010); *see also, Karoun Dairies, Inc. v. Karlacti, Inc.,* No. 08cv1521 AJB

4  (WVG), 2014 U.S. Dist. LEXIS 92723, at *33 (S.D. Cal. July 8, 2014) (noting a "clear conflict"

5  between California's and Lebanon's statutes of limitations and conducting a conflicts of law

6  analysis). Washington courts apply the "most significant relationship rule" in a choice of law

7  analysis. *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580, 555 P.2d 997 (1976); *see also*

8  *Williams v. Leone & Keeble, Inc*., 171 Wn.2d 726, 735 n.6, 254 P.3d 818 (2011) ("Our authorities

9  hold that the location of the injury is not necessarily determinative. Instead, Washington adheres

10  to the 'most significant relationship' test, as developed by the Restatement (Second) of Conflict of

11  Laws § 6 (1971), in a choice of law analysis."). *See also Cornelius v. DeLuca,* 709 F. Supp. 2d

12  1003, 1014, 1016 (D. Idaho 2010) (stating that Missouri's two year statute of limitations for fraud

13  claims would govern after conducting "most significant relationship" analysis).

14      Under the "Most Significant Relationship Test" from the Restatement (Second) of Conflict

15  of Laws, courts consider "(a) the place where the injury occurred, (b) the place where the conduct

16  causing the injury occurred, (c) the domicil , residence, nationality, place of incorporation and

17  place of business of the parties, and(d) the place where the relationship, if any, between the parties

18  is centered." RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 145 (1971). Here, the evidence

19  will show that the state with the most significant relationship to the case is Nevada.

20      Most of iShow's demonstration homes were sold or donated to Nevada residents. iShow's

21  use began in Nevada, and while the brand has a national reach, it has originated from the hundreds

22  of thousands of annual visitors to CES and to IBS in Las Vegas, Nevada. The NEXTGEN brand

23  was built by using the mark in Nevada and displaying homes to visitors coming from all over the

24

LOWE GRAHAM JONES ™

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1   United States. iShow has held a Nevada trademark registration for its business since 2004 that was

2   the first registration obtained. The evidence will clearly show that in a conflict of law analysis,

3   Nevada law should apply.

4

5   **D.    Lennar's Laches Defense Is Untenable**

6

7           Lennar will not be able to put forth sufficient facts to support the required laches factors:

8   "(1) strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing mark;

9   (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition

10  between senior and junior users; and (6) extent of harm suffered by the junior user because of

11  senior user's delay." *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983). As noted

12  above, the jury could reasonably find that NEXTGEN is suggestive, thereby eliminating the need

13  for evidence of acquired distinctiveness. Thus, regardless of which limitations period applies, this

14  Court may still find that laches does not apply. *See La Quinta Worldwide LLC v. Q.R.T.M., S.A.*

15  *de C.V.*, 762 F.3d 867, 878 (9th Cir. 2014) ("The district court concluded that even if the laches

16  period had run under the first step of analysis, the *E-Systems* factors do not favor barring La

17  Quinta's suit. We agree.")

18                *1.    iShow Has Diligently Enforced Its Mark*

19          As discussed below, Lennar's entire laches defense is barred by its own willful

20  infringement of the NEXTGEN mark. To the extent that Lennar's actions do not completely bar

21  its defense, this Court should find that iShow's delay in filing suit was reasonable. "[U]ntil there

22  exists an actual clash of interests or until the expansion of the owner's mark into the infringer's

23  territory is on the verge of implementation so that the likelihood of public confusion looms large,

24  there is no basis for an infringement suit." *Johanna Farms, Inc. v. Citrus Bowl,* Inc., 468 F. Supp.

25  866, 881 (E.D.N.Y. 1978) (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 362

PLAINTIFF'S TRIAL BRIEF - 27
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES™

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1   (2d Cir. 1959)); *see also Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n,* 465

2   F.3d 1102, 1108 (9th Cir. 2006) (citing *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 462

3   (4th Cir. 1996)).

4        iShow disputes that the "clock" for laches starts in September 2011, when iShow first

5   learned of the potential for infringement. Lennar's adoption of NEXT GEN in residential

6   construction services, like all trademark use, did not occur until it used NEXT GEN in interstate

7   commerce beyond mere token use. Lennar's NEXT GEN registration is primarily focused on areas

8   that, while related to residential construction, was focused on mortgage and insurance consulting

9   services. Indeed, the facts will show that when Mr. Barnett met with Lennar's regional president

10  Mr. Jeff Roos on September 27, 2011, Mr. Roos said that Lennar's use of NEXT GEN would be

11  different from iShow's. *See,* Barnett Decl., Dkt. 45, at ¶ 7.

12       The jury will find that iShow should not be penalized for amassing resources, and learning

13  additional information about the nature and extent of Lennar's foray into residential construction

14  and design services under the NEXT GEN mark.

15         **2.   iShow Will Be Harmed If Relief Is Denied**

16

17       Pursuant to this Court's Order, Dkt. 93, iShow will not put forth evidence of its actual

18  damages to support an award of actual damages under the Lanham Act. However, as described in

19  *E-Systems* and its progeny, iShow must still be permitted to demonstrate how it will be harmed to

20  demonstrate why laches should not apply here. *La Quinta Worldwide*, F.3d at 879 (affirming denial

21  of laches defense because "the district reasonably concluded, following its likelihood of confusion

22  analysis… that the two marks will compete with each other in the United States with significant

23  harm to La Quinta, the senior user"). Here, the evidence will show how iShow would be harmed

24  if Lennar is permitted to wield the laches defense.

PLAINTIFF'S TRIAL BRIEF - 28
Civil Action No. 2:15-cv-01550

### 3. *Lennar's Willful Infringement Is a Complete Bar to Relief*

Contrary to Lennar's belief as made apparent in its proposed jury instructions, the jury must consider Lennar's willfulness throughout the entire presentation of evidence. Because laches is an equitable determination, Lennar's willful infringement *operates as a complete bar* to Lennar's defense of laches. *See National Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955) (citing *Menendez v. Holt*, 128 U.S. 514, 523 (1888)). *See also Danjaq LLC v. Sony Corp*, 263 F.3d 942, 956. "Over the past eighty-five years, various courts have held that laches does not bar a suit against a deliberate infringer. This principle appears to be based on the equitable maxim that 'he who comes into equity must come with clean hands . . . .'" *Id.* (citing *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (*quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945)). "[L]aches that will operate as a bar are measured in each case by equitable considerations, and, in a case of intentional and continuing invasion of the plaintiff's rights, the delay, in order to constitute a defense, must be such as to amount to assent or acquiescence." *Matzger v. Vinikow*, 17 F.2d 581, 583 (9th Cir. 1927). Some courts conclude that it is only "where the delay is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time that the balance of the equities would favor the knowing infringer." *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir. 1965).

### 4. *Lennar Is Incapable of Demonstrating Prejudice*

Lennar has not shown that it has endured the requisite prejudice to support a finding of laches. Under Ninth Circuit law, "generic claims of prejudice do not suffice for a laches defense." *In re Beaty*, 306 F.3d 914, 928 (9th Cir. 2002) (citing cases). Lennar will be unable to establish this causal link because it never intended to stop using the mark NEXTGEN. Not at any point. For example the facts will show that after the opposition proceeding, Lennar was aware that this dismissal with prejudice had no *res judicata* application, as later confirmed by this Court. *See* Dkt.

LOWE GRAHAM JONES PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1  22. Lennar nevertheless chose to continue using the mark and there was nothing about iShow's

2  delay that impacted Lennar's decision to continue using NEXTGEN.

3      Lennar has not offered any documentary evidence to support the required causal link of

4  prejudice (such as an opinion of counsel).  In short, no reason exists that might somehow show

5  that Lennar would have stopped using NEXT GEN in 2012 had it known iShow would eventually

6  sue in federal court. Had Lennar conducted even a rudimentary analysis of iShow's right to sue

7  following dismissal of the opposition proceeding in 2012, that analysis would have resulted in a

8  finding that iShow maintained a right to sue. And if Lennar ever seriously evaluated the risks, it

9  would have concluded that it was infringing and that it should therefore stop using the mark.

10 Lennar should not be rewarded by failing to engage in this analysis, and for failing to act

11 reasonably under the circumstances.

12      The federal registrations were drawn to a variety of unobjectionable practices, including

13 "consultation services" and "financing" and iShow reasonably dropped its opposition to

14 registration while keeping options open to sue in federal court when and if the harm justified such

15 a suit and "loomed large." The evidence will show that Lennar knowingly risked an adverse

16 judgment because it had the power and money to do so. Lennar bet millions in profits on the chance

17 that iShow would not pursue these claims, and did not take this case seriously until it actually

18 realized how much money was at risk.  *See,* Dkt. 79-17, pp. 20:1-21:5 ("There's more at stake than

19 we thought there was…")

20

21

22

23

24

LOWE GRAHAM JONES pllc
701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1

## V.  CONCLUSION

2

3      For all of the foregoing reasons, the evidence will show that Lennar infringed iShow's

4  valid trademark rights, that Lennar's profits should be awarded to iShow, and that Lennar should

5  be enjoined from causing further confusion and harm to iShow's trademark rights.

6      DATED this 19th day of July, 2017.

7                                              LOWE GRAHAM JONES[PLLC]

8                                              s/Mark P. Walters
                                               Mark P. Walters, WSBA No. 30819
9                                              Tim J. Billick, WSBA No. 46690
                                               *Walters@LoweGrahamJones.com*
10                                             *Billick@LoweGrahamJones.com*
                                               701 Fifth Avenue, Suite 4800
11                                             Seattle, Washington 98104
                                               T: 206.381.3300
12                                             F: 206.381.3301

13                                             *Attorneys for Plaintiff iShow.com*

14

15

16

17

18

19

20

21

22

23

24

1

## <u>CERTIFICATE OF SERVICE</u>

2

I, Tim Billick, hereby certify that I am an employee of Lowe Graham Jones PLLC and that on, July 10, 2017 I electronically filed and served the foregoing with this **CERTIFICATE OF SERVICE** to the following counsel of record by the method/s indicated:

3

4

| PARTY/COUNSEL | METHOD OF SERVICE |
|---|---|
| **Christopher E. Hawk, WSBA No. 43307** <br> GORDON & REES LLP <br><br> 121 SW Morrison, Suite 1575 <br> Portland, OR 97204 <br><br> Phone: (503) 222-1075 <br> Fax: (503) 616-3600 <br> Email: chawk@gordonrees.com <br><br> *Attorneys for Defendants Lennar Corporation and Lennar Pacific Properties Management, Inc.* | ☐ Via Hand-Delivery <br> ☐ Via U.S. Mail <br> ☑ Via CM/ECF System <br> ☐ Via E-mail |
| **David M. Gersten, Fla. Bar No. 205801** <br> *(Admitted Pro Hac Vice)* <br> **Joseph A. Sacher, Fla. Bar No. 174920** <br> *(Admitted Pro Hac Vice)* <br> GORDON & REES SCULLY MANSUKHANI, LLP <br><br> Miami Tower <br> 100 SE Second St., Suite 3900 <br> Miami, FL 33131 <br><br> Phone: (305) 428-5300 <br> Fax: (877) 634-7245 <br> Email: dgersten@gordonrees.com <br> Email: jsacher@gordonrees.com <br><br> *Attorneys for Defendants Lennar Corporation and Lennar Pacific Properties Management, Inc.* | ☐ Via Hand-Delivery <br> ☐ Via U.S. Mail <br> ☑ Via CM/ECF System <br> ☐ Via E-mail |
| **Megan K. Smith, CA Bar No. 307381** <br> *(Admitted Pro Hac Vice)* <br> **David J. Marroso, CA Bar No. 211655** <br> *(Admitted Pro Hac Vice)* <br> **Drew E. Breuder, CA Bar No. 198466** <br> *(Admitted Pro Hac Vice)* <br> O'MELVENY & MYERS LLP | ☐ Via Hand-Delivery <br> ☐ Via U.S. Mail <br> ☑ Via CM/ECF System <br> ☐ Via E-mail |

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

LOWE GRAHAM JONES™

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301

1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067

Phone: (310) 246-8574
Phone: (310) 246-8469
Phone: (310) 246-6713
Email: megansmith@omm.com
Email: dmarroso@omm.com
Email: dbreuder@omm.com

*Attorneys for Defendants Lennar
Corporation and Lennar Pacific
Properties Management, Inc.*

Dated this 19th day of July, 2017.

LOWE GRAHAM JONES PLLC

s/*Tim J. Billick*
Tim J. Billick

PLAINTIFF'S TRIAL BRIEF - 33
Civil Action No. 2:15-cv-01550

LOWE GRAHAM JONES PLLC

701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
206.381.3300 • F: 206.381.3301